UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LANCE L. ELLIOTT, | CASE NO. 1:20-CV-00545 |
| Plaintiff, | JUDGE JAMES R. KNEPP |
| v. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### Introduction

Plaintiff Lance L. Elliott filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income ("SSI"). (Doc. #1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to me for preparation of a report and recommendation pursuant to Local Rule 72.2 (Non-document entry dated May 26, 2021). Following review, and for the reasons stated below, I recommend the Commissioner's decision be reversed and remanded for further proceedings consistent with this report.

### Procedural Background

On February 15, 2011, Mr. Elliott's mother, Karen Elliott, protectively filed an application for SSI on his behalf. (Tr. 118). The Commissioner denied the claim initially, on reconsideration, and after a hearing before an Administrative Law Judge. (*Id.*). Mrs. Elliott protectively filed a second application for SSI on Mr. Elliott's behalf in April 2014. (*Id.*) That

claim was also denied initially, on reconsideration, and after a hearing before the ALJ in February 2016. (*Id.*).

Mr. Elliott filed the current application for SSI on May 15, 2017, alleging disability beginning on February 27, 2016. (Tr. 15). The claim was denied initially in July 2017, and on reconsideration in September 2017. (*Id.*). Mr. Elliott filed a timely written request for hearing in October 2017. (*Id.*). He, his mother, and a vocational expert ("VE") testified at a hearing before the ALJ on September 7, 2018. (*Id.*). The ALJ found Mr. Elliott not disabled in a written decision. (Tr. 15-32). The Appeals Council denied Mr. Elliott's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1). Mr. Elliott filed his complaint in the district court on March 12, 2020. (Doc. #1).

### Personal Background and Testimony

Mr. Elliott was 19 years old on his alleged onset date. (Tr. 117). He alleges disability due to autism, obsessive compulsive disorder, Asperger's, attention deficit hyperactivity disorder (ADHD), anxiety, depression, and obesity. (Tr. 118). Although he graduated from high school in 2016, he has never worked. (Tr. 125-26).

Mr. Elliott testified at the hearing. This is significant for its brevity and provided *in toto*.

> Q. Mr. Elliott, essentially, this morning, I want to go over several areas with you. And then I'm going to turn over the questioning to Ms. Gilbert. I want to talk with you a bit about your background, your education, your past work, if any. And then, in your own words, sir, what prevents you from working or what interferes with that ability. But first, are you still living on Dodgeville Road, in Rome?
> A. I know Dodgeville, but I never heard of Rome.
> Q. I mean, are you living in the City of Rome, Ohio?
> A. I don't know what Rome is.
> Q. Do you know what city you live in?
> A. City?
> Q. Yes, sir.
> A. Ash – Ash – Ash – Ashton. I don't know. We go to somewhere Ash – Ashton.

2

Q. Well, let me ask you, who do you live with?

A. My mom.

Q. Anyone else live with you in your home?

A. No.

Q. So you know your height? Your weight?

A. I don't – I don't know my weight.

Q. Do you know your height?

A. I was told 5-something. I don't remember. I'm sorry.

ALJ: And, Ms. Gilbert, are you arguing any physical severe impairments? Or is this a mental impairment?

Atty: Your Honor, we're arguing the mental health impairments. He's had treatment for some pain issues with regards to his back and his feet. But they seem relatively minor, by comparison.

Q. Sir, have you ever held a full-time job?

A. No.

Q. Now do you have a driver's license?

A. My mom says my license isn't in here; that I should've brought it today. This –

Q. Well, do you have a license or a state ID?

Atty: It's a state ID

ALJ: Thank you, Ms. Gilbert.

Q. Do you drive a car?

A. No. I –

Q. Now –

A. I don't know how to drive.

Q. Now, sir, tell me, in your own words, what prevents you from working or what interferes with that ability?

A. When I see people, I just can't think. Nothing comes.

Q. What about when you're at home? In your home, with your mother. I mean, how do you do there?

A. Nothing.

Q. How do you spend your days? What do you do during the course of a normal or average day?

A. I sit in the kitchen with my mom, and we just –

Q. And what do you like to do for fun?

A. I just – I just hang in the house with my mom – with – in –

Q. Now –

A. And we just – we talk. She tries to talk to me, but makes me feel sad that I just – I can't – I – words just don't come to me like – makes her sad, makes me feel angry.

Q. I mean, do you still collect bottle caps?

A. Bottle caps, if I find on the road, like I pick up. Yeah.

Q. I mean, you used to play video games. Do you still do that or not?

A. I remember loving them, but it's not – I don't feel like it – anything. I don't feel like it, anymore.

Q. When did you stop feeling like it?

3

> A. A while ago.
> Q. What's that? When you say a while ago, was it this year? This summer? This spring? A year ago? Two years ago? When?
> A. I don't – it just feels like a long time ago. It's just stopped – I stopped having – stopped feeling fun.
> Q. I mean –
> A. It's like it's just – everything just feels just hard.
> Q. Now you used to go shooting with a .22.
> A. No. I'm –
> Q. When did you last go shooting?
> A. I never – that wasn't fun.
> Q. Well, when did you last do that?
> A. Like when I saw my dad, long time ago. We –
> Q. You say a long time ago. Was that this year? Last year? When, about?
> A. My – I – what's – I haven't counted the days, so it feels like a long time ago. I don't know what year. It's – feels like I just – I'm sorry, I haven't counted the days.
> ALJ: Ms. Gilbert, do you have any follow-up of Mr. Elliott?
> Atty: No, Your Honor.
> ALJ: Mr. Elliott, my understanding is, Ms. Gilbert, that you wanted his mother, Karen Elliott, to testify on his behalf.
> Atty: Yes, Your Honor.
> ALJ: And then, Mr. Elliott, what we'll do, sir, I'll ask you to take a seat. And, Ms. Gilbert, if you'd invite Ms. Elliott in?
> Atty: Certainly
> CLMT: I don't own any guns.
> ALJ: And, sir, wait –
> CLMT: I'm not –
> ALJ: Don't say anything. Wait for your –

(Tr. 53-56).

Mrs. Elliott also testified at the hearing. She stated Mr. Elliott began struggling to communicate with others in 2008. (Tr. 69). He had more difficulty after his oldest sister passed in 2015. (Tr. 66). Mr. Elliott's ability to communicate has continued to decline. (Tr. 70).

She testified that Mr. Elliott is incapable of taking care of himself. She helps him shower – she hands him the soap and shampoo through the curtain to ensure that he washes up – puts his clothes on the sink for him, puts toothpaste on his toothbrush, and helps him with his deodorant. (Tr. 57, 64).

She testified that Mr. Elliott does not tolerate long car rides (Tr. 57) and explained that she had to stop at three different exits – Chardon, Kirtland, and East 55th Street – on the way to the hearing to calm him down. (Tr. 68-69). When this happens, he first expresses frustration, then anger, and becomes tearful. (Tr. 69).

She testified to his constant anxiety ("Any little thing causes anxiety. He's always anxious, always worried"). (Tr. 58). Just two days before the hearing she told Mr. Elliott he had to go to bed early because he had an appointment the following day with his psychiatrist. (*Id.*). Mr. Elliott paced most of the night and slept "maybe two hours." (*Id.*). At the appointment, the doctor had to help reassure Mr. Elliott that he would be okay at the hearing and it would be over shortly. (*Id.*).

The ALJ asked if Mr. Elliott still enjoyed collecting bottle caps and playing video games. Mrs. Elliott testified that he stopped doing those things about three years prior. (Tr. 59). When the ALJ asked when Mr. Elliott last went shooting, Mrs. Elliott explained that once or twice, in 2015 or 2016, his father came over and "shot in the backyard for like ten minutes." (Tr. 59, 60). It is unclear whether Mr. Elliott himself shot a firearm.

Mrs. Elliott testified that Mr. Elliott occupies his days by playing with his dog and watching cartoons, somewhat, and that he wanders from room to room, looks at bottle caps and his *Mad* magazines, and sits on the couch. (Tr. 62, 63, 64). She bought him little jigsaw puzzles, but he would get upset and throw them. (Tr. 63). On a typical day, she wakes Mr. Elliott and gives him his medication, helps him shower, and makes him breakfast. (Tr. 64). He does not make his own meals, do his own laundry, or do housework. (Tr. 65, 66, 67). If his sister visits, she will try to talk to Mr. Elliott. (Tr. 64). While Mrs. Elliott will tolerate his requests to repeat

5

things she says to him ("If I say something, he'll ask me to repeat it, and then that could go on for two or three hours."), he gets upset when his sister will not do the same. (Tr. 60).

Mrs. Elliott testified about Mr. Elliott's reticence to leave the house. She does not leave him home alone. (Tr. 61). Trips outside the house must be quick as Mr. Elliott cries and throws temper tantrums in stores. (*Id.*). He threw a hot dog at a wall in a restaurant because it had onions on it. (*Id.*). When a librarian shushed him, Mr. Elliott verbally lashed out at her and knocked over a book or bookshelf. (Tr. 68). He does not like to attend his psychiatric appointments but will tolerate the visits once there. (*Id.*). While at a Speedway gas station, someone from school said hi to Mr. Elliott. He stood there, unable to respond. (Tr. 71). When Mr. Elliott and his mother returned to the car, he started "banging [his] head with [his] hand" and said, "I'm so stupid." (*Id.*).[1]

She testified that she tries to get him outside, but he does not like it. (Tr. 62). The ALJ asked about Mr. Elliott planting bushes and trees, in reference to a recent treatment note. Mrs. Elliott explained that she planted squash seeds for the pet iguana and encouraged Mr. Elliott to come outside to look at the growth. (*Id.*).

Finally, the VE testified regarding Mr. Elliott's ability to obtain work. The ALJ asked the VE to assume a hypothetical individual of Mr. Elliott's age and education who is limited to performing simple, routine, and repetitive tasks, but not at a production rate pace; limited to simple work-related decisions in using his judgment and dealing with changes in the work setting; able to frequently interact with supervisors and occasionally interact with co-workers and the public. (Tr. 75-76). The VE determined that such an individual could perform work and listed mold filler, racker, and garment-related bagger as suitable positions. (Tr. 76).

---

[1] The transcript indicates that Mr. Elliott engaged in this behavior during the hearing: "He's been doing that a lot. And then right here, too, I noticed." (Tr. 71).

The VE's assessment did not change when the hypothetical individual could occasionally interact with supervisors (*id.*), nor when, additionally, the hypothetical individual could never interact with the public. (Tr. 77). He reduced the identified job positions by forty percent when the hypothetical individual could never interact with co-workers. (*Id.*). When the ALJ added the additional limitation that the hypothetical individual "would be off task twenty percent of an eight-hour work shift and/or absent from work two days per month," the VE testified that either one of those limitations would preclude all work. (Tr. 77-78).

### Educational Records

As the ALJ noted, the record confirms a history of decreased cognitive function. (Tr. 24). Tests from 2009, 2012, and 2014 revealed full-scale IQ scores of 77, 81, and 64, respectively. (Tr. 369, 370, 471). An individualized education plan (IEP) evaluation conducted in May 2015 showed that Mr. Elliott operated at the low average range of global academic skills in comparison to his peers. His perceptual reasoning, working memory, and processing speed were well below average for his age. (Tr. 382). He displayed average reading and written language skills but very low math scores. (*Id.,* Tr. 375).

The examiner noted that Mr. Elliott quickly became frustrated with multi-digit multiplication problems and was unable to complete any division problems. (Tr. 371). He "worked at a slow and methodical pace while answering questions and completed all items presented to him." (Tr. 370). Sometimes the examiner had to prompt him for a response. (*Id.*).

Overall, the examiner found that Mr. Elliott functioned in the low average range of cognitive ability, demonstrating a significant weakness in math skills. (*Id.*). His teachers reported that Mr. Elliott was unorganized and unprepared for class, easily distracted, and did not ask for assistance when needed. (Tr. 369, 373, 374, 382). The examiner determined that Mr. Elliott

needed to improve basic math knowledge, calculation skills, nonverbal reasoning abilities, and organizational skills. (*Id.*). He needed to increase his time on task and would benefit from extended time to complete assignments and working in a small group atmosphere. (*Id.,* Tr. 373, 374, 376). As a result of his major learning deficits, Mr. Elliott took academic classes in the resource room. (Tr. 392). He graduated from high school in May 2016 with a 2.257 GPA and a rank of 82 of 95 students. (Tr. 409).

### Relevant Medical Records[2]

In 2009, Mr. Elliott began treatment with the Community Counseling Center of Ashtabula for depression, anxiety, inattention, impulsivity, mood swings, and sleep issues. (Tr. 311, 315). At the intake session, he indicated having trouble with school subjects, particularly math. (*Id.*). He became easily frustrated and had a limited attention span. (*Id.*). Certain classmates bullied him about his weight. (*Id.*). Mr. Elliott's mother reported constant repetitive questioning, where he would ask his mother and father to repeat what they said. (*Id.,* Tr. 316). Mr. Elliott stated he had friends at school and in his neighborhood, and he liked to play video games, go to the park, and go swimming. (Tr. 312).

The intake specialist noted Mr. Elliott was overweight but well-groomed. (Tr. 316). He displayed average demeanor and eye contact, exhibited full affect, spoke clearly, and had racing but logical thoughts. (Tr. 316-17). Though cooperative, Mr. Elliott appeared agitated and became argumentative when his mother discussed his repetitive questioning. (Tr. 317). He did not have good insight into his behaviors and displayed impaired attention/concentration. (*Id.*). He was diagnosed with obsessive compulsive disorder. (Tr. 319).

---

[2] To place Mr. Elliott's claims in proper perspective, the ALJ's decision included a discussion of evidence predating Mr. Elliott's alleged onset date. The same relevant evidence is included here for its longitudinal value.

After the initial intake assessment, Mr. Elliott underwent a psychiatric evaluation with Dr. Krishna Devulapalli. (Tr. 322). He reported feeling sad, depressed, and unhappy. (*Id.*). Mental status examination revealed Mr. Elliott was overweight and casually groomed. (*Id.*). He spoke clearly but sought frequent clarification. (*Id.*). He denied suicidal ideation, delusions, and hallucinations.[3] (*Id.*). Dr. Devulapalli noted Mr. Elliott displayed limited judgment and insight and appeared to be of low intellectual functioning. (*Id.*).

Dr. Devulapalli diagnosed depression not otherwise specified with obsessive features and borderline intellectual functioning. (*Id.*). He additionally noted obesity, problems in social and academic functioning, and assigned a global assessment of functioning (GAF) score of 45. (*Id.*). Dr. Devulapalli prescribed Zoloft 25 mg and trazodone 50 mg. (*Id.*).

In addition to medication management with Dr. Devulapalli, Mr. Elliott saw Joleen Sundquist, LPCC-S at the Community Counseling Center of Ashtabula for individual behavioral health treatment. He attended thirteen one hour-long sessions between August 25, 2009 and September 17, 2010. (Tr. 309-10).[4] The record does not contain the treatment notes for these sessions.

Mr. Elliott attended appointments for medication management with Dr. Devulapalli from August 2009 to July 13, 2018. Dr. Devulapalli's records show diagnoses of disruptive mood dysregulation disorder, attention deficit hyperactivity disorder, and autistic spectrum disorder. (Tr. 323, 326, 328, 330, 332, 334, 336, 360, 433, 438, 441, 443, 447, 451).

---

[3] The record shows Mr. Elliott consistently denied thoughts of self-harm, hallucinations, and delusions. (*See also* Tr. 323, 326, 328, 330, 332, 334, 336, 360, 433, 438, 441, 443, 447, 451).

[4] The ALJ's most recent decision does not mention these sessions. In a prior unfavorable decision from February 2016, the ALJ noted: "The claimant had medication management visits with Dr. Devulapalli every 2 or 3 months. There is no indication of any specific therapy or counseling apart from the 15-minute medication management sessions, so this is fairly routine treatment." (Tr. 96).

On April 7, 2016, Mr. Elliott reported to Dr. Devulapalli that he was mostly unhappy but sometimes felt "hyper and happy." (Tr. 323). He expressed shame about his upcoming graduation because of the time and extra help he needed in school and reported feeling lonely, except when he had contact with his girlfriend. (*Id.*). Mental status examination revealed Mr. Elliott was fairly cooperative and able to express some feelings. (*Id.*).

At his appointment on July 25, 2016, Mr. Elliott was mostly quiet and unable to express himself. (Tr. 326). Compliance with medication was sporadic. (Tr. 325). He graduated but was unemployed. (*Id.*). His mother reported Mr. Elliott was content to stay at home and was uncomfortable being around people or in social situations. (Tr. 326).

On September 19, 2016, Mr. Elliott was mostly quiet. (Tr. 327). He reported to Dr. Devulapalli that he did not want to leave home to come to the appointment and that his mom did not give him advance notice. (Tr. 328). His mother stated she felt "he cannot live independently on his own." (Tr. 327). Dr. Devulapalli discussed guardianship issues with Mr. Elliott. (Tr. 328).

Mental status examination on January 23, 2017 revealed Mr. Elliott was not oriented to place and date. (Tr. 330). He was cooperative but "did not express himself much." (*Id.*). Mr. Elliott missed a previous appointment and had run out of medication. (Tr. 329). His mother reported he was not doing well – he could not take care of himself, could not focus or concentrate, had memory issues, and was getting easily irritable and agitated. (*Id.*). She stated Mr. Elliott was better when he complied with taking his medications but still did not associate with anybody. (*Id.*). Dr. Devulapalli filled out guardianship paperwork for his mother. (*Id.*).

On March 22, 2017, Mr. Elliott's mother reported concerns about his poor hygiene, lack of motivation, mood swings, and overall depression. (Tr. 331-32). Mental status examination revealed anxious mood and affect, along with tearfulness. (Tr. 332). He admitted to "periodic

10

depression and at times being perky for a short bit of time." (*Id.*). Dr. Devulapalli discontinued Seroquel and prescribed Latuda 40mg. (*Id.*). He continued Mr. Elliott's prescriptions for Zoloft 150 mg, Vistaril 25 mg, and methylphenidate 54 mg. (*Id.*).

On April 26, 2017, Mr. Elliott's mood and affect were anxious. (Tr. 333-34). He complained about noises in the neighborhood. (Tr. 333). His mother reported he still tended to agitate easily. (*Id.*). Dr. Devulapalli continued his medications but increased the dosage of Latuda to 60 mg. (Tr. 334).

On May 24, 2017, Mr. Elliott was cooperative, did not appear emotional, and claimed that the medications were helping. (Tr. 336). His mother reported that he still does not get out of the home and was frustrated "about his social skills and his own obsessive thinking." (Tr. 335). The notes indicate Dr. Devulapalli continued his medications but increased the Vistaril to 25 mg twice per day. (*Id.*).

On July 19, 2017, Mr. Elliott exhibited an anxious mood and affect. (Tr. 360). He expressed guilt, continually saying "I am sorry" as his mother discussed his isolation, withdrawal, and extreme emotions. (Tr. 359). She reported not being able to attend a graduation ceremony because Mr. Elliott would not leave the house. (*Id.*). She also related an incident where Mr. Elliott began pounding on the walls because he wanted the dog, sleeping in a bedroom closet, to come out. (*Id.*). Mr. Elliott admitted feeling sadness and irritability. (Tr. 360). Dr. Devulapalli increased his dosage of Latuda to 80 mg and continued the other medications. (*Id.*).

On September 13, 2017, Mr. Elliott was unable to identify what makes him anxious and emotional. (Tr. 433). He reported that he does not like leaving home. (Tr. 432). His mother reported he began to hit himself when he gets overly emotional. (Tr. 433). The doctor increased his Vistaril to 25 mg three times per day and continued his other medications. (*Id.*).

11

On November 17, 2017, Mr. Elliott came to his appointment with his sister instead of his mother. (Tr. 441). He reported that the Vistaril helped him control his emotions. (*Id.*). He continued to have a difficult time expressing himself but did better individually than when his mother accompanied him. (*Id.*).

On January 22, 2018, mental status examination revealed that Mr. Elliott was cooperative but anxious and had fair to limited insight and judgment. (Tr. 438). Dr. Devulapalli noted that although Mr. Elliott was able to focus better on medication and was not having any manic or hypomanic symptoms, he struggles with changes and transitions, has a hard time being around people because of his anxiety, and is unable to sleep well at night. (*Id.*). He increased Mr. Elliott's Vistaril to 100 mg per day. (*Id.*).

At his appointment on March 19, 2018, Mr. Elliott stated he had a tough time talking to strangers on the phone. (Tr. 443). He also related continued difficulties with sleep. (*Id.*). Mental status examination showed he was cooperative but anxious and had fair to limited insight and judgment. (Tr. 444). He did not express any depressive symptoms or major changes. (*Id.*).

On May 14, 2018, Mr. Elliott expressed continued difficulties with sleep. (Tr. 446). He struggles to fall asleep but could not say whether he was excessively worried about anything. (*Id.*). He did not endorse depressive symptoms. (Tr. 447). On mental status examination, Dr. Devulapalli noted that Mr. Elliott was cooperative but anxious and had fair to limited insight and judgment. (*Id.*).

On July 13, 2018, Mr. Elliott again stated he had trouble sleeping and admitted that overthinking was an issue. (Tr. 451). He related doing things to help him relax such as planting bushes and trees but admitted getting "frustrated when something doesn't go right." (*Id.*). Mental

status examination revealed he was cooperative but anxious, had difficulty expressing himself, and had fair to limited insight and judgment. (*Id.*).

Over the course of a single year, Dr. Devulapalli changed or increased Mr. Elliott's medications six times. The doctor noted the medications helped Mr. Elliott to focus but "he struggles with changes and transitions, has a hard time being around people because of his anxiety, and is unable to sleep well at night." (Tr. 438).

### Psychological Consultations

State disability determination services psychological consultants reviewed Mr. Elliott's claim, though neither spoke with nor examined him. § 416.1015. The review included the ALJ's prior decision, a prior consultative examination in 2014, records from appointments with Dr. Devulapalli, a Function Report that Mrs. Elliott completed, records from his primary health care physician's office, and the Field Office examiner's observations from a face-to-face interview with Mr. Elliott on June 19, 2017. (Tr. 121, 235).

The Function Report declares that Mr. Elliott has autism, ADHD, OCD, and insomnia, and is obese. (Tr. 251). He is housebound. (*Id.*). He cannot tell time or tie his own shoes. (*Id.*). His mother helps him take his medications and shower. (Tr. 250). She makes all his meals for him. (*Id.*). He spends time coloring, watching television, and petting, though not caring for, his dog. (*Id.*). His mother supervises his time with the dog because he gets too rough. (Tr. 246). He does not know how to put clothes on properly, cannot work the shower, will not use soap or shampoo, does not shave, makes a mess when feeding himself, and does not wipe well after toileting. (*Id.*). He does not do yard or housework because his back and feet hurt due to obesity and he cannot focus on any work. (Tr. 249). Mr. Elliott spends most of his time inside because he is fearful of the outside and has episodes when his mother takes him shopping or to the doctor's

office. (*Id.*). He does not go anywhere alone because he needs to be comforted during his episodes. (*Id.*). He has never learned to drive and has difficulty putting on his seatbelt without help. (*Id.*). He does not pay bills, handle a savings or checking account, and cannot count change due to his math learning disability. (*Id.*). He needs to be reminded to wipe his nose when he sneezes, push his glasses up, and comb his hair. (Tr. 248). His mother encourages him to make his bed, but he cannot do chores or help around the house. (*Id.*). He has problems getting along with others because he gets very emotional and takes things out of context. (Tr. 247). Mr. Elliott's outbursts have gotten worse with age; he cries more and screams louder. (*Id.*). He can concentrate for a few seconds and does not finish what he starts. (*Id.*). He has difficulty following written and spoken instructions. (*Id.*). Mr. Elliott does not do anything on a regular basis because his day is dictated by his mood. (*Id.*). He does not get along well with authority figures because he thinks he is always being criticized. (Tr. 245). When he is stressed or confronted with a change in routine, Mr. Elliott shakes, cries, and rocks back and forth. (*Id.*). He says he must go home right now and that he cannot breathe. (*Id.*).

The Field Office examiner observed the following:

> Claimant was neatly dressed and groomed. He wore glasses. He had the social skills and communication skills of a very young child even though he is 20 years old. He had trouble answering basic questions and relied heavily on his mother to assist him. She ended up responding to most of the questions while he doodled on paper. His comprehension is severely limited. He spoke very slowly and using basic words. He was very anxious throughout the 1 hour and 45 minute interview, and kept asking his mother if they could go home. He had poor eye contact and would not sign forms in front of me, because he said, "I am shy and you are pretty." So I had to close the window to let him sign the paperwork. His handwriting is like that of a child. His mother is trying to get legal guardianship of him, but the cost is currently prohibitive for her. His mother had to read all of the forms and paperwork for him.

(Tr. 121).

14

On July 14, 2017, psychological consultant Vicki Warren, Ph.D., found mild limitation in understanding, remembering, or applying information, moderate limitations in interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself, and adopted the ALJ's February 2016 mental residual functional capacity assessment:

> The ALJ found that the [claimant] had a capacity to perform a full range of work at all exertional levels, but would be limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work). He is limited to simple work[-]related decisions in using his judgment and dealing [with] changes in the work setting. He is further limited in frequent interaction [with] supervisors and occasional interaction [with] co-workers and the public.

(Tr. 125). Dr. Warren found Mr. Elliott's impairments could reasonably be expected to produce his symptoms (limitations in understanding and memory, sustained concentration and persistence, social interactions, and ability to adapt) (Tr. 124), but the intensity and impact on functioning "are not consistent with the totality of the evidence." (*Id.*). She noted that, as an example, Mr. Elliott claims severely limited comprehension, but he passed most of his Ohio Graduation Tests (OGTs), performed well in school, and can understand and play video games. (*Id.*).

Karla Delcour, Ph.D., a second psychological consultant, affirmed these findings on reconsideration on September 18, 2017. (Tr. 139).

### Medical Source Opinion

Dr. Devulapalli filled out a form entitled "Medical Source Statement – Mental Capacity." He determined Mr. Elliott had at least marked limitations in the four broad areas of functioning. (Tr. 449-50).

As to Mr. Elliott's ability to understand, remember, and apply information, Dr. Devulapalli found Mr. Elliott had marked limitations in the following areas: understand and learn

15

terms, instructions, or procedures; follow 1- or 2-step oral instructions to carry out a task; describe work activity to someone else; ask and answer questions and provide explanations; recognize a mistake and correct it; sequence multi-step activities; and use reason and judgment to make work related decisions. Dr. Devulapalli opined that Mr. Elliott had extreme limitation in his ability to identify and solve problems. (Tr. 449).

Regarding his ability to interact with others, Dr. Devulapalli found marked limitations in Mr. Elliott's ability to cooperate with others, state his own point of view, and respond to requests, suggestions, criticism, corrections, and challenges. (*Id.*). Dr. Devulapalli found extreme limitations in Mr. Elliott's ability to ask for help when needed; handle conflicts with others; initiate or sustain conversation; understand and respond to social cues; and keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. (*Id.*).

With respect to his ability to concentrate, persist, or maintain pace, Dr. Devulapalli found marked limitations in Mr. Elliott's ability to: (1) work at an appropriate and consistent pace; (2) complete tasks in a timely manner; (3) ignore or avoid distractions while working; (4) change activities or work settings without being disruptive; (5) work close to or with others without interrupting or distracting them; and (6) sustain an ordinary routine and regular attendance at work. Dr. Devulapalli found extreme limitations in Mr. Elliott's ability to initiate and perform a task that he understands and knows how to do, and work a full day without needing more than the allotted number or length of rest periods during the day. (Tr. 450).

As to his ability to adapt or manage himself, Dr. Devulapalli found marked limitations in Mr. Elliott's ability to: (1) manage his psychologically-based symptoms; (2) distinguish between acceptable and unacceptable work performance; (3) set realistic goals; (4) make plans for himself independent of others; (5) maintain personal hygiene and attire appropriate to a work setting; and

(6) be aware of normal hazards and take appropriate precautions. (*Id.*). Dr. Devulapalli found

extreme limitations in Mr. Elliott's ability to respond to demands and adapt to changes. (*Id.*).

To support his assessment, Dr. Devulapalli stated: "I have known him for a number of

years. He is socially and verbally limited. He has difficulty with comprehension and

understanding. He gets easily emotional and/or irritable. He cannot get his moods regulated."

(*Id.*).

**Consultative Examination**

Bryan J. Krabbe, Psy.D., met with Mr. Elliott and his mother on August 16, 2018 for a

consultative examination. He noted Mr. Elliott was cooperative and able to establish rapport

adequately. (Tr. 473). He did not appear to exaggerate or minimize his difficulties, and put forth

good effort completing tasks. (*Id.*).

Dr. Krabbe found Mr. Elliott spoke slowly and with frequent pauses. (*Id.*). He was

nervous and deferred to his mother often. (*Id.*). He did not display loose associations or delusions

during the examination. (*Id.*). He occasionally needed questions repeated or simplified. (*Id.*). Mr.

Elliott appeared anxious and trembled during the interview. (*Id.*). He was alert, and responsive

and oriented to time, place, person, and situation. (*Id.*).

Mr. Elliott explained to Dr. Krabbe that:

> [It] [f]eel[s] like I'm going to cry… When I step out my door, feel
> like everything is coming in on me… Sad only when I step outside…
> I don't want to talk to people but I don't want people to be mad or
> hate me… I don't want to be looked a… Feel like nobody
> understands me.

(Tr. 472).

Mr. Elliott endorsed common symptoms of depression including poor quality mood,

feeling worthless, loss of energy, insomnia, decreased motivation, concentration problems, social

17

withdrawal, and crying spells. Mr. Elliott did not describe manic symptoms and denied self-harm ideation, plans, or intent. (*Id.*). Mr. Elliott endorsed symptoms related to anxiety including restlessness, fatigue, difficulty concentrating, irritability, muscle tension, and sleep disturbance. Mr. Elliott expressed worry about social interactions, performing in front of others, being observed by others, and possible embarrassment. (*Id.*).

Mr. Elliott's mother related he rarely leaves the house, has frequent emotional outbursts, and worries all the time. (*Id.*).

When asked about his daily routine, Mr. Elliott stated he goes to bed and wakes up at varying times. (*Id.*). The examiner asked Mr. Elliott how he spends his time, to which Mr. Elliott replied, "I play with my green iguana and spray him with water, watch the news." (*Id.*). With prompting, Mr. Elliott said he could attend to his daily hygiene and do household chores, but needs assistance shopping for groceries, paying bills, and preparing basic meals. (*Id.*). He reported difficulty remembering appointments and medication. (*Id.*). He is unable to drive and has no regular social contact outside his family. (*Id.*).

Dr. Krabbe asked Mr. Elliott to perform a series of tasks designed to test memory, abstract reasoning ability, and fund of information. He found Mr. Elliott had difficulty following conversation and responding to direct questions. (*Id.*). He was able to recall three digits forward but zero digits backward. (Tr. 473).[5] He recalled two of three words after a brief delay. (*Id.*). He was unable to identify the three most recent presidents. (*Id.*). He had difficulty recalling aspects of his upbringing. (*Id.*). He could not identify the president during the Civil War and did not know Martin Luther King, Jr. (*Id.*). Mr. Elliott could not count backwards from 100 by sevens in thirty seconds, nor could he count backwards from twenty by threes. (*Id.*). He had difficulty

---

[5] The ability to recall four digits backward is considered average. (Tr. 473).

calculating division and fractions. (*Id.*). He scored in the below average range when asked to describe similarities between two words. (*Id.*). He could not explain the meaning of the phrase "what goes around comes around." (*Id.*). He was able to identify three cities in the world but did not know how many seconds were in one minute. (*Id.*). All told, his general level of intelligence appeared to fall in the borderline range. (*Id.*). Dr. Krabbe noted that emotional factors may have interfered with his performance. (*Id.*).

Based on his below average performance, Dr. Krabbe opined that Mr. Elliott may have difficulty in a work setting, specifically with acquiring new information, decreased attention and concentration, limited coping skills to adapt to pressure and respond to changes, and increased agitation. (Tr. 475-76). Dr. Krabbe also noted that Mr. Elliott "presented as nervous and trembled during the evaluation, which may affect level of engagement with co-workers and supervisors." (Tr. 475).

Dr. Krabbe assessed Mr. Elliott's functional limitations. As to his ability to understand, remember, and carry out instructions, Dr. Krabbe found some moderate and some marked limitations. (Tr. 467). He determined that Mr. Elliott had moderate limitations in his ability to understand, remember, and carry out simple instructions. (*Id.*). He opined that Mr. Elliott had marked limitations in the ability to make judgments on simple work-related decisions, understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related instructions. (*Id.*). In support of this assessment, Dr. Krabbe noted Mr. Elliott's previous full-scale IQ score of 64, receipt of special education services, below average performance on mental status tasks, and his difficulty answering questions and requiring simplification, and that he trembled throughout the examination. (*Id.*).

Dr. Krabbe opined that Mr. Elliott had marked limitations interacting appropriately with the public, supervisors, and co-workers. (Tr. 468). He also determined that Mr. Elliott had marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*). To support his assessment, Dr. Krabbe stated "[c]laimant presented as very nervous and trembled. Claimant had difficulty conversing. He has never been employed. Symptoms of anxiety and depression may lead to emotional instability and withdrawal." (*Id.*).

### Alleged Errors

Mr. Elliott presents two issues for judicial review: whether the ALJ erred when he concluded that Mr. Elliott had only moderate limitations in the four areas of mental functioning; and whether the ALJ erred by failing to perform a meaningful analysis of examining source opinions unpersuasive. (Doc. #11, 541).

### Standard of Review

In conducting judicial review, the Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings that are unsupported by substantial evidence. *Blakley v. Comm'r of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan v. Comm'r of Social Security,* 474 F.3d 830, 833 (*citing Besaw v. Sec'y of Health and Human Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992)). The findings of the Commissioner are not subject to reversal merely because the record contains substantial evidence supporting a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). This is

because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Id.* at 773. But the Sixth Circuit has also stated: "[A] substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 Fed.App'x 636, 641 (6th Cir. 2013) (*quoting Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Reversal is required when the Commissioner fails to apply the correct legal standards as promulgated by the regulations. *See, e.g., White v. Comm'r of Social Security,* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Social Security,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold the Commissioner's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996).

## Applicable Legal Principles

### 1. Five-Step Sequential Analysis

The Commissioner determines whether a claimant is disabled using a five-step sequential evaluation. 20 C.F.R. § 416.920(a). Under this evaluation, the Commissioner must determine: (1) whether the claimant is engaging in substantial gainful activity; (2) whether the claimant has an impairment or a combination of impairments that is severe; (3) whether the impairment meets or equals one of the listed impairments acknowledged to preclude substantial gainful activity enumerated in 20 C.F.R. § 404, subpart P, appendix 1; (4) whether the impairment prevents the claimant from performing work done in the past; and (5) if the claimant is unable to perform past work, whether the claimant can perform other work in the national economy. *Id.* At step three, if the claimant's impairment does not meet or equal a listed impairment, then the Commissioner assesses the claimant's residual functional capacity ("RFC"), *i.e.,* the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from the impairment. *Id.*

### 2. Special Technique to Evaluate Mental Impairments

In addition to that procedure, the Commissioner follows a special technique to evaluate the severity of mental impairments in adults. 20 C.F.R. § 404.1520a. The technique is applied at each step of the five-step analysis. *Id.* Under the technique, the Commissioner first evaluates pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable impairment. *Id.* These are known as the "paragraph A" criteria. If the Commissioner finds a medically determinable impairment, it then rates the degree of functional limitation resulting from the impairment. *Id.*

22

Assessing functional limitations is "a complex and highly individualized process that requires [the Commissioner] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." *Id.* The Commissioner rates the degree of functional limitation based on the extent to which the claimant's impairment interferes with his "ability to function independently, appropriately, effectively, and on a sustained basis," and therefore considers "such factors as the quality and level of [the claimant's] overall functional performance, any episodic limitations, the amount of supervision or assistance [the claimant] require[s], and the settings in which [the claimant is] able to function. *Id.* The Commissioner uses a five-point scale (none, mild, moderate, marked, and extreme)[6] to rate the claimant's degree of limitation in four broad functional areas: the ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. This is collectively known as the "paragraph B" criteria. *Id.*

To satisfy the paragraph B criteria, a claimant's mental disorder must result in either an extreme limitation of one, or marked limitation of two, paragraph B areas of mental functioning. 20 C.F.R. § 404, subpart P, appendix 1. The Commissioner uses all relevant medical and nonmedical evidence in the record to evaluate a claimant's mental functioning limitations. *Id.*

### 3. Assessing Medical Opinions

Also relevant to this case is the evaluation of medical opinions. For claims filed on or after March 27, 2017, the Commissioner does not defer or give specific evidentiary weight to any medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c. Rather, the

---

[6] A moderate limitation indicates that a claimant's functioning in an area independently, appropriately, effectively, and on a sustained basis is fair. A marked limitation indicates a claimant's functioning is seriously limited. Appendix 1 to Subpart P of 20 C.F.R. § 404 at (F)(2).

Commissioner evaluates the persuasiveness of such opinions and findings after considering their supportability, consistency, the medical provider's relationship with the claimant, specialization, and other factors that tend to support or contradict the opinion or finding. *Id.* The Commissioner considers supportability[7] and consistency[8] as the two most crucial factors in determining persuasiveness. The regulations require the Commissioner to explain how it considered those two factors in its disability determination. *Id.*

## ALJ Opinion

In a written decision dated February 26, 2018, the ALJ concluded Mr. Elliott had not engaged in substantial gainful activity since his alleged onset date. (Tr. 17). Next, the ALJ found Mr. Elliott had severe impairments of mood dysregulation disorder, attention deficit hyperactivity disorder (ADHD), autism spectrum disorder, borderline intellectual functioning, learning disorder, depression, and anxiety. (*Id.*). However, none of these impairments, alone or in combination, met or equaled the severity of a listed impairment. (Tr. 18). The ALJ concluded Mr. Elliott had the residual functional capacity

> to perform a full range of work at all exertional levels but with the following non-exertional limitations: limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work-related decision in using his judgment and dealing with changes in the work setting; and able to occasionally interact with supervisors and coworkers and never interact with the public.

(Tr. 22). He determined Mr. Elliott did not have past relevant work, was a younger individual on his alleged onset date, had a high school education, and communicated in English. (Tr. 31). He

---

[7] "*Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[8] "*Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

also found jobs existing in significant numbers in the national economy that Mr. Elliott could

perform given his age, education, and RFC. (*Id.*). Thus, the ALJ concluded Mr. Elliott had not

been under a disability, as defined by the Social Security Act ("SSA"), from May 15, 2017

through the date of his decision.

**Analysis**

**1. Paragraph B Criteria**

As to the first alleged error, Mr. Elliott argues that substantial evidence does not support

the ALJ's assessment of the paragraph B criteria, specifically the assessments of Mr. Elliott's

ability to understand, remember, or apply information and his ability to interact with others,

because the ALJ reached his conclusions "by over relying on activities of daily living and

cherry-picking the medical evidence, educational records, and hearing testimony to include only

evidence that supports his conclusion." (Doc. #11, 549, 551). The Commissioner responds that,

despite Mr. Elliott's emphasis of contrary evidence, substantial evidence supports the ALJ's

decision. (Doc. #13, 575).

Here, the ALJ considered listings for neurocognitive disorder (12.02), depressive disorder

(12.04), intellectual disorder (12.05), anxiety and obsessive-compulsive disorder (12.06),

personality and impulse-control disorder (12.08), autism spectrum disorder (12.10), and

neurodevelopmental disorder (12.11) and determined that Mr. Elliott did not satisfy the

paragraph B criteria. (Tr. 18).

The ability to understand, remember, or apply information refers to the abilities to learn,

recall, and use information to perform work activities. Examples include understanding and

learning terms, instructions, procedures; following 1- or 2-step oral instructions to carry out a

task; asking and answering questions and providing explanations; and using reason and judgment

to make work-related decisions. *See* Listing 12.00(E), describing adult mental disorders.

The ALJ found moderate limitation in Mr. Elliott's's ability to understand, remember, or

apply information:

> The record contains reports of difficulty with memory,
> understanding, following instructions, and completing activities
> (Exhibit C3E, Hearing Testimony). The educational evidence of
> record confirms a history of learning disorder, with receipt of special
> education services, and recent mental health treatment notes confirm
> borderline intellectual functioning and autism spectrum disorder,
> with slow conversation speech, below average language skills,
> borderline range intelligence, and impaired memory on examination
> (Exhibit C6F, C3F, C4F, C5F, C9F, C10F, C11F, C13F, C16F).
> However, the claimant has a high school education, and in fact
> graduated with a GPA of 2.257 and class rank of 82 out of 95
> students (Exhibit C6F/46). The claimant reportedly is unable to
> drive, cook, perform household chores, shop independently, or
> handle money; however, he was able to play football, video games,
> and engage in target shooting during high school (Exhibit C3E;
> C3F/18; C6F/7). Recent treatment notes indicate the claimant is able
> to garden and play with pets, and in August 2018, the claimant
> admitted he could attend to his daily hygiene and perform household
> chores (Exhibit C13F/1; C16F).

(Tr. 19).

I find the ALJ did not properly assess Mr. Elliott's degree of functional limitation and, in

addition, parsed the record and relied on information not relevant to Mr. Elliott's ability to

understand, remember, or apply information. As such, I conclude the ALJ's finding of moderate

limitation is not supported by substantial evidence.

Mr. Elliott's graduation from high school with a C average may suggest a finding of

moderate or less than moderate limitation. However, Mr. Elliott had an IEP and required

additional support, corrective measures, and monitoring. The school provided additional

accommodations—double time to complete assignments and tests, small group instruction, and a

reader. (Tr. 390). His IEP notes that, in 2015, he was working at a third-grade level in math calculation and applied problems. (Tr. 387). He was, therefore, excused from passing Ohio's standardized math test. (Tr. 393). While the record discloses an acknowledgement of Mr. Elliott's IEP, the ALJ's decision does not reflect the degree of accommodation necessary for Mr. Elliott to graduate, which undercuts the finding of moderate or less limitation.

The ALJ's decision also emphasizes that Mr. Elliott played football in high school. The demands of playing organized sports – including learning, remembering, and applying the complex rules of a team sport, assessing the playing field, and making quick, reasoned judgments – may indicate a higher degree of functioning. However, the ALJ's determination that Mr. Elliott played football in high school is not supported by evidence in the record. The ALJ's decision cites only a single emergency room record from May 23, 2018 that stated Mr. Elliott "denies any previous injury except when he was playing high school football he may have had an upper back injury that resolved." (Tr. 456, 457). Meanwhile, Mr. Elliott's medical records from 2009 and forward note that he is obese and does not regularly exercise. Moreover, his education records do not indicate that Mr. Elliott participated in *any* extracurricular activities, much less organized interscholastic football, as the ALJ apparently concluded.

Likewise, the ALJ's decision stresses Mr. Elliott's ability to play video games and target shoot to support his assessment of Mr. Elliott's functional limitations. But, the ALJ's decision failed to consider additional relevant, uncontroverted evidence that Mr. Elliott no longer plays video games. Mrs. Elliott's testimony, summarized above, is consistent with this. Similarly, the ALJ's decision failed to address the qualifying evidence that Mr. Elliott's father, once or twice at best, shot in the backyard for ten minutes.

The ALJ's decision cited Mr. Elliott's ability to play with his pets, garden, attend to daily hygiene, and perform household chores. But, the decision does not discuss that Mr. Elliott's mother helps him bathe, puts toothpaste on his toothbrush, handles his medication, and assists him in toileting. She must watch his play with the dog because he gets too rough. Mr. Elliott's inability to complete tasks when he gets frustrated or the supervision and assistance he requires to engage in these activities was not properly considered. This is contrary to the SSA's requirement that it consider "multiple issues and all relevant evidence to obtain a longitudinal picture of [a claimant's] overall degree of functional limitation," the amount of supervision or assistance a claimant requires, and the settings in which a claimant is able to function. 20 C.F.R. 404.1520a(c).

All told, I find the ALJ's finding of moderate limitation is not supported by substantial evidence. The decision relies on unsupported factual conclusions and parses the record by highlighting nominal activities of daily living while minimizing, or failing to consider, the acute level of support and assistance Mr. Elliott requires with even the most basic activities of daily living.

The second paragraph B criteria, interacting with others, refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include cooperating with others; asking for help when needed; initiating or sustaining conversation; responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free from excessive irritability, sensitivity, argumentativeness, or suspiciousness. Listing 12.00(E).

In interacting with others, the ALJ found moderate limitation:

> The record contains consistent reports of difficulty with others, rendering the claimant essentially homebound, and examinations have been notable for a consistently anxious mood and affect, occasional tearfulness, and impaired insight and judgment (Exhibit

> C3E, C3F, C4F, C5F, C9F, C10F, C11F, C13F, C16F). However, the claimant has been consistently cooperative and able to easily establish rapport on examination (*Id.*). The claimant does not shop independently, go out alone, or socialize with people other than family members; however, he was able to play team sports in high school, had a girlfriend at the time of graduation, and can spend time with his mother and sister, and shop in stores and go to restaurants with his mother (Exhibit C14F/3; C3F/18; C3E; C16F; Hearing Testimony).

(*Id.*).

The ALJ's decision regarding the paragraph B criteria here fares no better. As above, it parses the record to form an inaccurate picture of Mr. Elliott's ability to interact with others. It states Mr. Elliott can spend time with his mother and sister, but does not address Mr. Elliott's incessant requests to repeat their words and the resulting tantrums when they do not. The decision claims that Mr. Elliott can go to stores and restaurants with his mother but gives no consideration to evidence revealing Mr. Elliott's significant difficulties in sustaining conversation and acting appropriately in public. It is evident that the ALJ's decision did not engage sufficiently with the evidence contrary to its conclusion.

Additionally, the ALJ's decision does not build an accurate and logical bridge between the evidence and its conclusion. It fails to address how being able to spend time with only his mother and sister (but even then requiring that they continually repeat statements to him) or going to the store for short periods of time is reflective of Mr. Elliott's ability to interact with others independently, appropriately, effectively, and on sustained basis, as would be required in a work setting.

Because the ALJ's decision is erroneous in its assessment of two areas of functioning, and a thorough and reasoned review may result in finding marked limitations, the error is not harmless.

Mr. Elliott does not claim error as to the ALJ's findings of moderate limitation to his ability to concentrate, persist, or maintain pace or his ability to adapt or manage himself. Therefore, I decline to address those conclusions but note that the errors documented above are compounded in the rest of the decision below. On remand, the record needs a more careful, nuanced, and full analysis, one that considers the examples reflective of the areas of functioning set forth by the Commissioner and bases conclusions on evidence relevant to Mr. Elliott's ability to function independently, appropriately, effectively, and on a sustained basis in each of those areas of functioning.

### 2. Medical Opinions

As to the second alleged error, Mr. Elliott argues the ALJ did not meaningfully analyze the evidence from Dr. Devulapalli and Dr. Krabbe for consistency or supportability. I agree.

Notably, the ALJ found the state agency consultant opinions to be consistent with the evidence of record,

> including examination findings of tearfulness, an anxious mood and affect, slow, anxious speech, below average language skills, difficulty expressing himself, impaired attention, concentration, and memory, below average abstract reasoning abilities, borderline range intelligence, and limited insight and judgment, but consistently cooperative behavior and responsiveness on examination, with no evidence of overt confusion, adequate energy, normal thoughts and associations, and intact ability to express some feelings and easily establish rapport. (Exhibit C3F, C4F, C5F, C6F, C9F, C10F, C11F, C13F, C16F).

(*Id.*). The cited evidence consists of the educational record, Dr. Devulapalli's progress notes, and Dr. Krabbe's opinion.

### a. Dr. Krishna Devulapalli

Dr. Devulapalli found Mr. Elliott had marked and extreme limitations in all four areas of functioning. The ALJ found this opinion unpersuasive because, although supported by narrative

discussion, the doctor's conclusions "are inconsistent with the objective record as a whole, including Dr. Devulapalli's own progress reports," specifically, "consistently cooperative behavior and responsiveness on examination, with no evidence of overt confusion, adequate energy, normal thoughts and associations, and intact ability to express some feelings and easily establish rapport." (Tr. 28).

The ALJ's decision does not explain how that evidence contradicts Dr. Devulapalli's opinion of marked and extreme limitations, especially when the medical evidence of record documents tearfulness, anxious mood, slow and anxious speech, impaired attention, concentration, and memory, below average abstract reasoning abilities, borderline range intelligence, and limited insight and judgment, which all tend to support the doctor's functional limitations. Therefore, substantial evidence does not support the determination that Dr. Devulapalli's opinion is unpersuasive.

### 2. Dr. Krabbe's Opinion

As noted above, Dr. Krabbe found that the effects of Mr. Elliott's mental impairments resulted in some moderate and some marked functional limitations. The ALJ found Dr. Krabbe's opinion unpersuasive because

> it was based in part upon inaccurate self-reported statements. For example, the claimant's mother informed Dr. Krabbe that the claimant generally received Ds and Fs in school; however, this is inconsistent with the educational evidence of record, which indicates the claimant graduated high school with a 2.257 GPA and class rank of 82 of 95 students. Furthermore, the while the claimant endorsed regularly occurring symptoms of depression to Dr. Krabbe, his treating sources repeatedly noted no depressive symptoms on examination (Exhibit C1F, C3F, C4F, C5F, C10F, C11F, C13F). Thus, Dr. Crabbe's [*sic*] opinion lacks sufficient supportability. Furthermore, the findings of extreme psychiatric limitations are inconsistent with the remaining evidence of record, including the evidence of consistently cooperative behavior and responsiveness on examination, with no evidence of overt

> confusion, adequate energy, normal thoughts and associations, and intact ability to express some feelings and easily establish rapport, the limited conservative scope of mental health treatment, and indications of some improvement with the use of medication alone, despite some treatment of noncompliance.

(Tr. 29).

The determination Dr. Krabbe's opinion was unpersuasive is not supported by evidence in the record. First, Dr. Krabbe's opinion rests largely on his mental status examination and the results of a series of tasks designed to test memory, attention, concentration, abstract reasoning ability, fund of information, and general intelligence (Tr. 473, 474, 475-76), not on how many D's and F's Mr. Elliott received in school. Indeed, the functional assessment portion of Dr. Krabbe's opinion, in which he documents his analysis as to each area of functioning, does not contain any reference to letter grades. Rather, in addition to his mental status examination findings and task results, he supports his assessment with reports that Mr. Elliott had a history of problems with learning, attention, and concentration in school, all of which are found in the educational record.

The ALJ's second assertion, that Mr. Elliott's treating source—Dr. Devulapalli— repeatedly noted no depressive symptoms, is inaccurate. Mr. Elliott's treatment records, summarized above, are replete with evidence to the contrary.

The ALJ's final contention that Dr. Krabbe's findings of extreme psychiatric limitations are inconsistent with the record reflects a lack of thorough engagement with, and analysis of, Dr. Krabbe's opinion. An extreme limitation represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 416.920(a). Dr. Krabbe's assessment, summarized above, did not find Mr. Elliott extremely limited in any area of functioning. Rather, Dr. Krabbe found a mixture of moderate and marked functional limitations that would affect Mr. Elliott's ability to function in a work-related setting.

32

**Conclusion**

For the foregoing reasons, I recommend that the Court find the ALJ's paragraph B

findings and medical opinion articulation not supported by substantial evidence and remand to

the Commissioner.

Dated: June 29, 2021

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

**_ANY OBJECTIONS_ to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. _See United States v. Walters_, 638 F.2d 947 (6th Cir. 1981); _Thomas v. Arn_, 474 U.S. 140 (1985).**